**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-11-08206-PCT-NVW |
|---|---|
| Plaintiff, | **ORDER** |
| v. | |
| Christopher James, | |
| Defendant. | |

Before the Court is the Oral Motion for Acquittal by Defendant Christopher James (Docs. 109, 125 at 63:15-17). The Court has considered Defendant's Memorandum in Support of Oral Motion for Judgment of Acquittal Pursuant to Fed. R. Crim. P. 29(a) (Doc. 121), the United States' Response to Defendant's Motion for Judgment of Acquittal (Doc. 130), the evidence admitted at trial, the official transcripts of the jury trial in this matter (Docs. 122, 123, 124, 125), and oral argument on the motion, which was heard on September 23, 2013.

**I.     LEGAL STANDARD**

"After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The court may reserve decision on the motion, proceed with the trial, and decide the motion after the jury returns a guilty verdict. Fed. R. Crim. P. 29(b). "If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was

reserved." *Id.* "If the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29(c)(1).

In deciding a motion for judgment of acquittal, the district court, "after viewing the evidence in the light most favorably to the government, must determine whether the jury could reasonably find the defendant guilty beyond a reasonable doubt." *U.S. v. Bernhardt*, 840 F.2d 1441, 1448 (9th Cir. 1988). However, "it is the jury's exclusive function to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts." *Id.*

## II. PROCEDURAL HISTORY

On November 1, 2011, Defendant Christopher James was indicted on two counts of sexual abuse under 18 U.S.C. § 2242(2)(B), which defines sexual abuse as knowingly "engages in a sexual act with another person if that other person is . . . physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act." (Doc. 2.) The alleged sexual act in Count 1 involved "contact between the defendant's penis and the victim's vulva." *See* 18 U.S.C. § 2246(2)(A). The alleged sexual act in Count 2 involved "the penetration of the victim's genital opening with the defendant's finger" "with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." *See* 18 U.S.C. § 2246(2)(C). Both acts were alleged to have been committed on August 3, 2011, against a 28-year-old woman with severe cerebral palsy and developmental disabilities.

A jury trial was held on July 30 and 31 and August 1 and 2, 2013. On August 1, 2013, defense counsel moved on behalf of Defendant for judgment of acquittal. (Doc. 109.) The Court reserved ruling on the motion for judgment of acquittal under Rule 29(b). (Doc. 125 at 79:12-13.) At the close of evidence, defense counsel re-urged the Rule 29 motion for judgment of acquittal, and the Court reserved ruling on it. (Doc. 125 at 188:15-20.) On August 2, 2013, the jury returned a guilty verdict on each count. (Doc. 124 at 64:7-18.) The parties submitted post-trial briefing on the Rule 29 motion, and oral argument was heard on September 23, 2013.

**III. ANALYSIS**

For each count, the government was required to prove:

1. The Defendant knowingly engaged in a sexual act with the victim;
2. The victim was physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act;
3. The offense was committed in the District of Arizona, within the confines of the Fort Apache Indian Reservation; and
4. The Defendant was an Indian at the time.

**A.   Interpreting 18 U.S.C. § 2242(2)(B)**

Section 2242(2) includes two subsections. The first subsection makes it a crime to engage in a sexual act with another person if that other person is "incapable of appraising the nature of the conduct." 18 U.S.C. § 2242(2)(A). Although the government presented some evidence that the victim had mental disabilities, it did not charge Defendant under § 2242(2)(A). It charged Defendant only under the second subsection, § 2242(B), which makes it a crime to engage in a sexual act with another person if that other person is "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act."

Defendant contends that "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act" under 18 U.S.C. § 2242(2)(B) means unconscious or in a similar condition that renders the victim *temporarily* unable to communicate. The government contends that § 2242(2)(B) is not limited to a victim's temporary condition, and that it presented sufficient evidence from which a jury could reasonably find that the victim was incapable of effectively communicating to Defendant in a manner through which Defendant would have been able to understand her. As explained below, § 2242(2)(B) is not limited to circumstances in which the victim is temporarily "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act," and § 2242(2)(B) does not

- 3 -

1  require a jury to speculate regarding whether the Defendant would have been able to
2  understand the victim's communications.
3    Section 2242 was enacted in 1986 as part of H.R. 4745, which was intended to
4  modernize and reform the federal rape statutes. H.R. Rep. No. 99-594 (1986), *reprinted*
5  *in* 1986 U.S.C.C.A.N. 6186, 6186, 1986 WL 31966 *1, *6.  The House Judiciary
6  Committee reported that H.R. 4745 did not incorporate traditional rape law doctrines, but
7  instead explicitly defined all of the elements of each offense:

> **The offenses set forth in H.R. 4745 define completely what the prosecution must prove to establish its case.** Thus, for example, proposed section 2241 (aggravated sexual abuse) does not, by its terms, require the prosecution to show that the victim did not consent to the sexual act, nor does it require the prosecution to show that the victim resisted. The Committee believes such a requirement to be inappropriate to the offense defined in proposed section 2241 and intentionally omitted imposing such a requirement on the prosecution. Where the Committee believes it appropriate to the offense to require the prosecution to show that the conduct was engaged in without the victim's permission, such a requirement has explicitly been set forth.

17  1986 U.S.C.C.A.N. at 6193, 1986 WL 31966 at *13 (emphasis added). The Report
18  briefly describes proposed § 2242(2):

> Paragraph (2) of proposed section 2242 makes it an offense . . . to engage in a sexual act with another person who is incapable of appraising the nature of the conduct or physically incapable of declining participation in, or communicating unwillingness to engage in, the sexual act. There is no spousal immunity, and corroboration of the victim's testimony is not required. Lack of consent by the victim is not an element of the offense, and the prosecution need not introduce evidence of lack of consent or of victim resistance.[62]
>
> Note 62: In a prosecution under proposed section 2242(2)(B), the prosecution must show that the victim was physically incapable of declining participation in the sexual act or of communicating an unwillingness to engage in the

- 4 -

>sexual act. The prosecution is not required to show that the victim did not consent to the sexual act.

1986 U.S.C.C.A.N. at 6196, 1986 WL 31966 at *16. The House Judiciary Committee Report, however, does not elaborate on the meaning of "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act" under 18 U.S.C. § 2242(2)(B).

The parties have not cited, and the Court has not found, any federal cases that clarify the meaning of "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act" under 18 U.S.C. § 2242(2)(B). The Ninth Circuit has agreed with the Eighth Circuit that "[a] reasonable jury may conclude that a person who is asleep when a sexual act begins is physically unable to decline participation in that act." *United States v. Fasthorse*, 639 F.3d 1182, 1184 (9th Cir. 2011) (quoting *United States v. Barrett*, 937 F.2d 1346, 1347-48 (8th Cir. 1991)); *see also United States v. Papakee*, 573 F.3d 569 (8th Cir. 2009); *United States v. Williams*, 89 F.3d 165 (4th Cir. 1996). In *Fasthorse*, *Barrett*, *Papakee*, and *Williams*, the victims had been drinking heavily and, in two cases, had smoked marijuana before falling asleep. But these federal cases do not address circumstances similar to those here and do not address whether § 2242(2)(B) applies only to situations where the victim is asleep, intoxicated, or otherwise temporarily physically unable to communicate.

More helpful is an opinion of the Supreme Court of Connecticut that examined a state statute with language similar to that of § 2242(2)(B). *State v. Fourtin*, 307 Conn. 186, 52 A.3d 674 (2012). In *Fourtin*, the statutes at issue criminalized sexual intercourse with a person who was "physically helpless" at the time of the sexual intercourse and defined a "physically helpless" person as one who is "unconscious or for any other reason is physically unable to communicate unwillingness to an act." *Id.* at 188, 198, 52 A.3d at 676, 682. In a prior case the court had determined that a victim restrained on a stretcher was not "physically helpless" under the statute because she was able to communicate even though she could not resist. *Id.* at 199, 52 A.3d at 682. In *Fourtin*, therefore,

although the victim could not walk and needed assistance performing daily living activities, the question was not whether she could physically resist, but whether she had the physical ability to communicate unwillingness to an act. The evidence at trial showed she was nonverbal, but communicated with others by gesturing, vocalizing, and using a communication board. *Id.* at 189, 52 A.3d at 677. The victim indicated her displeasure by kicking, biting, and scratching; she also vocalized her feelings by groaning or screeching. *Id.* at 189-90, 52 A.3d at 677. The court concluded that the state had presented ample evidence that the victim was capable of communicating and had not produced any credible evidence that the victim "was either unconscious or so uncommunicative that she was physically incapable of manifesting to the defendant her lack of consent to sexual intercourse at the time of the alleged sexual assault." *Id.* at 212, 52 A.3d at 690.

The *Fourtin* court observed that case law from other jurisdictions, particularly New York, supported the view that "the physically helpless requirement was designed to protect victims who are unconscious or in a similar condition that has rendered them temporarily unable to communicate." *Id.* at 201, 52 A.3d at 683. But it found only one case directly on point, and in that case the New York Court of Appeals did not limit its consideration of the statute's applicability to a victim who was temporarily physically unable to communicate. *See id.* at 203-04, 52 A.3d at 685 (citing *People v. Huurre*, 84 N.Y.2d 930, 645 N.E.2d 1210 (1994)).

In *Hurre*, the New York Court of Appeals affirmed a lower court's determination that a nonverbal, profoundly retarded woman with cerebral palsy and epilepsy was not physically helpless within the meaning of the New York statute equivalent to the Connecticut statute. 84 N.Y.2d at 930, 645 N.E.2d at 1210; *see People v. Huurre*, 193 A.D.2d 305, 306-07, 603 N.Y.S.2d 179, 180 (1993). The victim's caretakers testified that she was able to communicate whether she did or did not want something by making and understanding a few signs, crying, pointing, shaking her head, and making facial expressions. 193 A.D.2d at 307-08, 603 N.Y.S.2d at 181. The lower court concluded

that the evidence adduced at trial, when viewed in the light most favorable to the prosecution, was legally insufficient to establish that the victim was physically unable to communicate unwillingness to an act:

> Although the victim, by virtue of her retardation, is not able to determine what she should or should not be unwilling to do, the testimony adduced at trial established that when she is unwilling to do something she communicates that unwillingness.

*Id.* at 307, 603 N.Y.S.2d at 180.  Relying on Huure, the *Fourtin* court concluded:

> In sum, even if the term "physically helpless" in § 53a-65(6) was not intended primarily to apply to a severely handicapped person who is able to communicate non-verbally, we agree with the conclusion in *Huurre* that a person's physical or intellectual disabilities do not preclude a finding that such a person, by virtue of his or her disabilities or other reasons, is physically helpless in the sense of being "physically unable to communicate unwillingness to an act."  Thus, regardless of the reason for the alleged inability to communicate, the key question in cases that require proof of physical helplessness is whether, at the time of the alleged sexual assault, the victim was physically able to convey a lack of consent or unwillingness to an act.

307 Conn. at 207, 52 A.3d at 687 (citation omitted).

The *Fourtin* court also noted "this appears to be a case in which the state ultimately proceeded against the defendant under the wrong statute." *Id.* at 210 n.20, 52 A.3d at 690 n.20.  Originally, the state had also charged the defendant with crimes that required that the victim be unable to consent to sexual intercourse because the victim was "mentally defective."  But the state chose to pursue only charges requiring proof that the victim was physically helpless.  "By electing to prove that the victim was physically helpless rather than mentally defective, the state removed from the case all issues pertaining to the victim's mental capacity to consent to sex." *Id.*  Similarly, *Huure* concluded that the prosecution had adduced legally sufficient evidence to support a

- 7 -

1  conviction on the theory that the victim was unable to consent to sexual contact by reason
2  of a mental defect, but that charge had been dismissed.  193 A.D.2d at 310.

3  The dissent in *Fourtin* would have held "there is legally sufficient evidence in the
4  record to support the jury's finding that the victim's physical and mental disabilities
5  rendered her 'physically unable to communicate unwillingness to an act.'"  307 Conn. at
6  220, 52 A.3d at 695.   The Connecticut statute defined "physically helpless" as
7  "unconscious or for any other reason is physically unable to communicate unwillingness
8  to an act."  Perhaps "for any other reason" in the Connecticut statute could be interpreted
9  to include "mentally defective" even though it would duplicate a separate offense.  But
10 § 2242(2)(B) was intended to "define completely what the prosecution must prove to
11 establish its case" and does not include the open-ended phrase "for any other reason."
12 Rather, § 2242(2)(B) requires the government to prove the victim is "physically
13 incapable," which is distinguished from "incapable of appraising the nature of the
14 conduct" in § 2242(2)(A), though the elements could overlap in particular cases.

15 Consistent with the reasoning of *Fourtin* and *Huurre*, § 2242(2)(B) applies not
16 only when the victim is unconscious or in a similar condition that renders the victim
17 temporarily unable to communicate, but also when the victim is "physically incapable of
18 declining participation in, or communicating unwillingness to engage in, that sexual act"
19 longer than temporarily.  But a person who is able to communicate unwillingness or
20 displeasure by vocalizations, gestures, or other actions is not "physically incapable of
21 declining participation in, or communicating unwillingness to engage in, that sexual act"
22 even if she cannot physically resist or she lacks the mental capacity to decide what she
23 should or should not be unwilling to do.

24 Finally, the government has provided no authority for its contention that even if
25 the victim could sometimes communicate in some manner, § 2242(2)(B) applies because
26 the Defendant would not have been able to understand her even if others could.  Because
27 the government did not present evidence that the Defendant would be unable to
28

1    understand the victim's head shaking and vocalizations of displeasure, such as growling,
2    it is not necessary to decide this issue.

   **B.   Evidence Presented at Trial Regarding Whether the Victim Was Physically Incapable of Declining Participation in, or Communicating Unwillingness to Engage in, the Sexual Act**

In her opening statement, the government's counsel said, "[The victim] communicates primarily nonverbally with gestures and sounds. She can say yes or no." (Doc. 122 at 13:10-11.) The government's witnesses included Special Adrian Jim, Patricia Shands, Mark Quay, and Jodie Quay.

Special Agent Adrian Jim testified that when he first met with the victim, she was crying and "[i]t didn't seem like she wanted to talk to us." (Doc. 123 at 15:15-16.) He testified that he interviewed the victim on a second visit, and the video recording of the second interview was played for the jury. The video showed the victim nodding her head in agreement and shaking her head for disagreement. Special Agent Jim testified that during the second interview the victim responded to his questions by nodding her head for yes and shaking her head for no. (*Id.* at 19:15-24.)

Patricia Shands, the victim's direct caregiver, testified that part of the victim's school program involving practicing language skills, such as "sounding out our ABCs and her vowels," working on the alphabet, and using flash cards with pictures to practice the sounds of letters. (*Id.* at 54:6, 55:6-9.) Ms. Shands testified that when the victim gets out of her wheelchair, she chooses where she wants to sit. (*Id.* at 57:6-11.) Ms. Shands also testified that the victim requires assistance to use the toilet, but "she'll moan when she's done" so that a caregiver can help her get back to her wheelchair. (*Id.* at 58:19-59:3.) Ms. Shands testified that the victim can talk, but sometimes she has difficulty understanding the victim, and it is easier for the victim to show you something than to tell you. (*Id.* at 60:17-20, 61:19-22.) She also testified that the victim has many friends at school, and she can express anger and dislike for someone. (*Id.* at 61:23-24, 68:6-8, 68.) Ms. Shands testified that the victim communicates by nodding or shaking her head and making grunting sounds. (*Id.* at 73:16-18.) She further testified that the victim can

communicate her needs and desires, such as when she needs to go to the bathroom, when she is finished using the toilet, when she wants to go play on the computer, when she wants to play games, when she wants to do something, and when she does not want to do something. (*Id.* at 74:10-75:7.)

Mark Quay, the victim's uncle, testified that the victim understands both English and Apache and responds to questions by nodding her head for yes and shaking her head for no. (*Id.* at 124:4-15.) He testified that she does not talk much, but she can talk. (*Id.* at 124:9-12.) Mr. Quay testified that sometimes she expresses that she loves him by hugging him. (*Id.* at 123:19-24.) He said that when he comes to her house, she always points at him and says "Mark" or "uncle." (*Id.* at 123:22-24.) He also testified that if you change the television channel when the victim does not want you to, she gets mad, growls, and gives you a mean look. (*Id.* at 125:4-12.) Mr. Quay further explained that when the victim gives you a mean look it looks like the mean look that others give. (*Id.* at 125:13-14.)

Jodi Quay, the victim's aunt, testified that on August 3, 2011, she saw the Defendant and the victim talking and laughing together, communicating. (*Id.* at 153:11-17.) Ms. Quay also testified that she can communicate with the victim, and the victim nods her head for yes and shakes her head for no. (*Id.* at 155:13-16.)

At the time the Court reserved ruling on Defendant's Rule 29 motion, the evidence showed that the victim was physically able to communicate her unwillingness to engage in a sexual act and physically able to decline participation in a sexual act by head movements and vocalizations such as growling. As in *Fourtin* and *Huurre*, the government may have been able to present evidence that the victim was "incapable of appraising the nature of the conduct"—such as evidence of mental limitations, developmental delay, and lack of knowledge about sex—sufficient to support a conviction under § 2242(2)(A). But the government did not charge Defendant under § 2242(2)(A). The victim's mental limitations likely affected her ability to know what she should and should not be unwilling to do, but § 2242(2)(B) requires evidence that the

- 10 -

victim is *physically incapable* of expressing unwillingness or declining participation. The evidence presented by the government at trial was not sufficient for a jury to reasonably find that the victim was "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act."

### C. Additional Elements of the Charges

Defendant summarily challenges the sufficiency of the evidence supporting finding the remaining elements of the offenses with which he is charged. The Court granted the government's motion to take judicial notice that the White Mountain Apache Tribe is a federally recognized tribe, and the jury was instructed accordingly. (Docs. 64, 87, 106, 123 at 11:16-12:4.) Defendant did not object to the motion or instruction and did not dispute that the alleged offenses occurred at the victim's home, in the District of Arizona, within the confines of the Fort Apache Indian Reservation. The government presented undisputed evidence that the Defendant was an Indian by testimony and documents showing that he is three-eighths White Mountain Apache and an enrolled tribal member. (Doc. 123 at 39:13-42:15.)

The government was required to prove that the Defendant knowingly engaged in a sexual act with the victim. For Count 1, the government was required to prove the sexual act involved contact between the Defendant's penis and the victim's vulva. For Count 2, the government was required to prove the sexual act involved the penetration of the victim's genital opening with the Defendant's finger with the intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person. Daniel Hawkins, a special agent for the Bureau of Indian Affairs at the time of the alleged offenses, testified that on August 5, 2011, and November 3, 2011, he read the Defendant his *Miranda* rights, the Defendant initialed each statement regarding his rights on a form, and both Special Agent Hawkins and the Defendant signed and dated the form for each interview. (Doc. 123 at 228-236, 243-245.) The forms regarding the Defendant's rights and a statement written by the Defendant on November 3, 2011, were admitted into evidence.

In response to Special Agent Hawkins' questions on August 5, 2011, the Defendant admitted that he had put his finger into the victim's genital opening. (*Id.* at 238:2-12, 242:1-9.) In response to Special Agent Hawkins' questions on November 3, 2011, the Defendant admitted that he removed the victim's pants and underwear, pulled down his own pants, got on top of the victim, and put his penis inside her. (*Id.* at 250:3-251:4.) In addition, the Defendant wrote and signed a statement that he was ashamed and did not know what made him do what he did. (*Id.* at 251:14-253:25.) Viewing the evidence in the light most favorable to the government, the evidence was sufficient for a jury to reasonably find the Defendant knowingly engaged in the sexual acts alleged in Counts 1 and 2 with the victim.

### D.     Judgment of Acquittal

Therefore, after viewing the evidence in the light most favorable to the government, the Court finds the evidence insufficient to sustain the convictions in this case. The jury could not reasonably find beyond a reasonable doubt that the victim was "physically incapable of declining participation in, or communicating unwillingness to engage in, that sexual act" at the time of the alleged sexual acts. The Court further finds that the government presented sufficient evidence from which a jury could reasonably find beyond a reasonable doubt that the Defendant knowingly engaged in the charged sexual acts with the victim, the offense was committed in Arizona, within the confines of the Fort Apache Indian Reservation, and the Defendant was an Indian at the time. Defendant's motion for judgment of acquittal will therefore be granted.

### E.     Conditional Ruling on a Motion for a New Trial

"If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed." Fed. R. Crim. P. 29(d)(1). The judgment of acquittal entered here is based entirely on interpretation of 18 U.S.C. § 2242(2)(B), an issue of law. If the judgment of acquittal is vacated or reversed on appeal, the Court finds no basis for a new trial.

1         IT IS THEREFORE ORDERED that the Oral Motion for Acquittal by Defendant
2  Christopher James (Doc. 109) is granted.
3         IT IS FURTHER ORDERED that the Clerk enter Judgment of Acquittal in favor
4  of the Defendant Christopher James.
5         IT IS FURTHER ORDERED that if the Judgment of Acquittal entered in this case
6  in favor of Defendant Christopher James is vacated or reversed, any motion for a new
7  trial would be denied.
8         IT IS FURTHER ORDERED that Defendant Christopher James is discharged
9  from custody.
10        Dated this 26th day of September, 2013.

_____
Neil V. Wake
United States District Judge